2017-1041

# United States Court of Appeals
# for the Federal Circuit

NICE SYSTEMS LTD., NICE SYSTEMS INC.,

*Plaintiffs – Appellants,*

*v.*

CLICKFOX INC.,

*Defendant – Appellee.*

*Appeal from the United States District Court for the District of Delaware in Case No. 1:15-cv-00743-RGA, Richard G. Andrews, Judge.*

## BRIEF FOR APPELLEE CLICKFOX INC.

DOUGLAS D. SALYERS
PUJA PATEL LEA
DUSTIN B. WEEKS
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308
(404) 885-3000
doug.salyers@troutmansanders.com
puja.lea@troutmansanders.com
dustin.weeks@troutmansanders.com

ANUP M. SHAH
TROUTMAN SANDERS LLP
201 S. College Street
34th Floor
Charlotte, NC 28202
(704) 998-4050
anup.shah@troutmansanders.com

*Counsel for Appellee, ClickFox Inc.*

March 23, 2017

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendant-Appellee ClickFox, Inc. certifies the following:

1.    The full name of every party represented by Troutman Sanders LLP:

      ClickFox, Inc.

2.    The names of the real party in interest represented by Troutman Sanders LLP:

      Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of ClickFox, Inc.:

      Not applicable.

4.    The names of all law firms and the partners or associates that have appeared for ClickFox, Inc. in the trial court or are expected to appear in this court and who are not already listed on the docket for the current case:

      TROUTMAN SANDERS LLP:  James E. Schutz

      WOMBLE CARLYLE SANDRIDGE, & RICE, LLP:  Mary W. Bourke

Dated: March 23, 2017.

                     */s/ Douglas D. Salyers*
                     DOUGLAS D. SALYERS
                     TROUTMAN SANDERS LLP
                     600 Peachtree Street, NE
                     Suite 5200
                     Atlanta, GA 30308
                     (404) 885-3000

                     *Counsel for Defendant-Appellee, ClickFox, Inc.*

-i-

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ..................................................................1

INTRODUCTION ..............................................................................................2

STATEMENT OF THE ISSUES........................................................................3

STATEMENT OF THE CASE............................................................................4

    A.    The Alleged Challenges Identified By NICE Were Neither
Argued Below Nor Addressed By The '955 Patent ............................4

    B.    NICE's Description Of Prior Art Methods Of Monitoring The
Internet Is Not Supported By The Record...........................................6

           1.    The *Costigan* Reference...........................................................7

           2.    The *Mancisidor* Reference.......................................................8

           3.    The *Vincent* Reference .............................................................9

    C.    The '955 Patent ................................................................................10

           1.    Representative Claim Of The '955 Patent ...............................10

           2.    The Written Description Of The '955 Patent...........................11

           3.    The Prosecution History Of The '955 Patent..........................14

    D.    NICE's Claim Construction Of "Modeled Sessions" Is Not
Supported..........................................................................................17

    E.    The District Court Determined That The Claims Are Directed
To An Abstract Idea .........................................................................19

    F.    The District Court Determined That The Claims Lack An
Inventive Concept.............................................................................21

SUMMARY OF THE ARGUMENT ..................................................................23

ARGUMENT ....................................................................................................24

    A.    Standard Of Review ..........................................................................24

    B.    NICE's Principal Brief Includes Newly Presented Theories And
Evidence Which This Court Should Decline To Consider ...............25

           1.    NICE's Newly Presented Theories Should Not Be
Considered By This Court .......................................................25

        2.     NICE's Newly Presented Evidence Should Not Be Considered By This Court ......................................................28

C.    Abstract Ideas Are Not Eligible For Patent Protection Unless They Claim an Inventive Concept....................................................30

D.    The '955 Patent Claims Fail To Recite Patent-Eligible Subject Matter ..............................................................................................31

        1.     Step One:  The '955 Patent Claims Are Directed To The Abstract Idea Of Cross-Channel Customer Service ................31

              a.     The '955 Patent Claims A Method For Cross-Channel Customer Service ............................................31

              b.     The Asserted Claims Are Directed To Cross Channel Customer Service, Not To Technological Improvements ......................................................34

              c.     The District Court Analyzed The Asserted Claims In The Proper Context ..................................40

        2.     Step Two:  The Claims of the '955 Patent Do Not Add Inventive Concept To The Abstract Idea Of Cross-Channel Customer Service....................................................44

              a.     The Asserted Claims Recite The Basic Concept Of Cross-Channel Customer Service Using Generic, Well-Known Elements ................................................45

                    (1)    The Individual Claim Limitations Recite Generic Computer Components And Processes ...........................................................45

                    (2)    The Ordered Combination Of The Claim Limitations Operates In A Conventional Manner......................................................55

        3.     The Claims Improperly Seek To Monopolize A Broad Swath Of Technology .............................................................60

CONCLUSION .......................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affinity Labs of Tex. v. DIRECTV, LLC,*
    838 F.3d 1253,1262 (Fed. Cir. 2016) ..................................................37, 40, 46

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
    134 S. Ct. 2347 (2014).................................................................................passim

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
    841 F.3d 1288 (Fed. Cir. 2016) ........................................................57, 58, 59

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.),*
    687 F.3d 1266 (Fed. Cir. 2012) ........................................................................51

*Bilski v. Kappos,*
    561 U.S. 593 (2010)......................................................................24, 30, 31, 53

*buySAFE, Inc. v. Google, Inc.,*
    765 F.3d 1350 (Fed. Cir. 2014) ................................................................32, 39

*Clarilogic, Inc. v. Formfree Holdings, Corp.,*
    No. 2016-1781, 2017 U.S. App. LEXIS 4769 (Fed. Cir. Mar. 15, 2017)....40, 56

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,*
    460 F.3d 1349 (Fed. Cir. 2006) ......................................................................25

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
    776 F.3d 1343 (Fed. Cir. 2014) ......................................................25, 47, 50, 55

*CyberSource Corp. v. Retail Decisions, Inc.,*
    654 F.3d 1366 (Fed. Cir. 2011) ................................................................passim

*DDR Holdings, LLC v. Hotels.com, L.P.,*
    773 F.3d 1245 (Fed. Cir. 2014) ................................................................34, 37

*Diamond v. Chakrabarty,*
    447 U.S. 303 (1980)..........................................................................................60

*Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014) ..........................................................53

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ...................................................passim

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ...................................................passim

*FairWarning IP, LLC v. Iatric Sys.*,
    839 F.3d 1089 (Fed. Cir. 2016) ..................................................41, 54

*Finnigan Corp. v. United States ITC*,
    180 F.3d 1354 (Fed. Cir. 1999) ..........................................................25

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
    582 F.3d 1288 (Fed. Cir. 2009) ..........................................................28

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
    527 F.3d 1318 (Fed. Cir. 2008) ..................................................25, 27

*Gottschalk v. Benson*,
    409 U.S. 63 (1972).............................................................................60

*HTC Corp. v. IPCom GmbH & Co.*,
    417 Fed. Appx. 976 (Fed. Cir. 2011)..................................................30

*In re Roslin Inst. (Edinburgh)*,
    750 F.3d 1333 (Fed. Cir. 2014) ..........................................................24

*In re TLI Communs. LLC Patent Litigation*,
    823 F.3d 607 (Fed. Cir. 2016) .....................................................passim

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015) ....................................32, 51, 54, 56

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    No. 2016-1077, 2017 U.S. App. LEXIS 3983 (Fed. Cir. Mar. 7, 2017) ...........47

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
    Nos. 2016-1128, 2016-1132, 2017 U.S. App. LEXIS 3982 (Fed.
    Mar. 7, 2017)...............................................................................40, 47

*Intellectual Ventures I LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016) ..................................................................42, 51

*LendingTree, LLC v. Zillow, Inc.*,
   656 Fed. Appx. 991 (Fed. Cir. 2016)..................................................................32

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ...........................................................................44

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012)...............................................................................passim

*Moore U.S.A., Inc. v. Std. Register Co.*,
   229 F.3d 1091 (Fed. Cir. 2000) ...................................................................28, 30

*MySpace, Inc. v. GraphOn Corp.*,
   672 F.3d 1250 (Fed. Cir. 2012) ........................................................................51

*OIP Techs., Inc. v. Amazon.com, Inc.*,
   788 F.3d 1359 (Fed. Cir. 2015) ...................................................................32, 51

*Phonometrics, Inc. v. Westin Hotel Co.*,
   319 F.3d 1328 (Fed. Cir. 2003) ........................................................................29

*Sage Prods. v. Devon Indus.*,
   126 F.3d 1420 (Fed. Cir. 1997) ...................................................................25, 28

*Smartflash LLC v. Apple Inc.*,
   No. 2016-1059, 2017 U.S. App. LEXIS 3833 (Fed. Cir. Mar. 1, 2017) ......50, 56

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014) ....................................................................passim

*Yufa v. TSI, Inc.*,
   600 Fed. Appx. 747 (Fed. Cir. 2015)..................................................................25

**STATUTES**

35 U.S.C. § 101 ................................................................................................passim

## <u>STATEMENT OF RELATED CASES</u>

This action has not been before this or any other appellate court under the same or similar title.  Counsel for ClickFox, Inc. are unaware of any other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# INTRODUCTION

The claims of the '955 patent cover the fundamental economic practice of cross-channel customer service and describe it with five steps: (1) extracting content related to an Internet user's online interactions; (2) associating the extracted content with the user; (3) storing and indexing the user's Internet interactions; (4) automatically comparing one or more of the user's Internet interaction sessions to a modeled session to generate a future recommendation; and (5) providing the recommendation to a call center agent while that agent is communicating with the user during a telephone call.

The district court found the asserted claims were directed to the abstract idea of cross-channel customer service because they cover the fundamental economic concept of gathering customer information from one communication channel and using it to engage the customer on another communication channel. Applying this Court's recent precedent, the district court then found that the asserted claims did not overcome a computer or Internet problem, but instead implemented this abstract idea using generic computer components.

Recognizing the problems with its patent, and the arguments it made below, Appellant NICE Ltd. and NICE Inc. ("NICE") has come up with new evidence and new arguments – both of which are procedurally improper. NICE identifies three new "technological challenges" the '955 patent allegedly overcame: (1) the

unprecedented volume of Internet data, (2) finding relevant information in that data, (3) and the inherent ambiguity of web-usage data. The claim language does not address, and the specification does not identify, any of these three new challenges as "problems" – much less technological problems – that it solved. Further, even though it argued below that no claim construction was needed, NICE now offers a claim construction for "modeled sessions" that does not match how this coined term is used in the specification.

As set forth below, NICE's new arguments should be rejected on both procedural and substantive grounds and the district court's decision should be affirmed.

## STATEMENT OF THE ISSUES

Whether the district court properly held that the claims of U.S. Patent No. 8,976,955 (the "'955 patent") cover patent-ineligible subject matter under 35 U.S.C. § 101 since they are directed to the abstract idea of cross-channel customer service, do not solve a problem rooted in computer or Internet technology, and lack an inventive concept because they (1) use generic computer components to carry out the abstract idea, and (2) use broadly claimed functional, results-oriented, and preemptive language.

## STATEMENT OF THE CASE

NICE's statement of the case includes arguments not made to the district court, relies on evidence not in the record and is based on misrepresentations about the claimed invention and the prior art. Accordingly, ClickFox provides the following summary to correct NICE's characterizations.

### A. The Alleged Challenges Identified By NICE Were Neither Argued Below Nor Addressed By The '955 Patent

For the first time on appeal, NICE argues that the '955 patent solved three "technological challenges" associated with monitoring a user's interactions with the Internet. Neither the claims of the '955 patent nor the written description address, much less solve, any of these newfound "technological challenges." (NICE Opening Brief ("NOB") 5-7, 42-44).

First, the '955 patent does not solve problems related to "massive . . . amounts of data" generated by users browsing the Internet. (*Id.* 6). Specifically, the claims of the '955 patent do not claim monitoring, storing, and analyzing the interactions of "millions of users." (*Id.*). Instead, the claims are directed to tracking and analyzing the Internet interactions of a single user to provide a recommendation for that user when the user later contacts a call center agent. (Appx108, 61:32-50). The specification is in accord and describes monitoring a single user's interactions with the Internet "[f]or example, each time *a user or customer* interacts with the web or Internet." (Appx79, 4:5-18 (cited by NOB 6);

4

*id.* 4:45-46 ("a web summary of *a user's* online . . . session may be retrieved"); *id.* 4:57-58 ("Web browsing on *a user's* private computer may be captured . . ."); Appx80, 5:46-48 ("Embodiments of the invention provide[] systems and methods for 'recording' or tracking *customer-specific* and/or session-specific web activity"); *id.* 5:56-58 ("The analyzed data for *a customer* may be provided to an agent serving or communicating with the customer.") (emphases added)).

Second, the claims do not cover "track[ing] important customer-specific information while discounting irrelevant information" or "differentiat[ing] relevant or useful Internet interaction data from other data." (NOB 6). The representative claim simply covers "extracting content" related to an Internet user's online interactions according to "predefined rules." (Appx108, 61:32-50). The "predefined rules," however, are not specifically defined, and the specification says they can be many things, including "customer search words" and "a type of web object." (Appx79, 4:9-17; Appx108, 61:54-64; Appx424, ¶5). Nowhere does the '955 patent state that it is extracting only "relevant or useful Internet interaction data." Nor does the '955 patent disclose any method for determining what content is "useful" or "relevant" and distinguishing that from "irrelevant information" generated by the user when browsing the Internet.

Third, the claims do not address the problem of any "inherent ambiguity associated with web-usage data." (NOB 7). The claims do not state and the

specification does not provide any method for determining whether a consumer who spends time on a webpage is "genuinely interested" or "has stepped away from his or her computer and forgotten to log off." (*Id.*). Nor does the '955 patent disclose any method for "ask[ing] the customer directly" what information from the user's Internet session is relevant, which could clear up any ambiguity from the user's Internet browsing behavior. (*Id.*; Appx108, 61:32-50). The claims do not recite any "added functionality" that could resolve ambiguity associated with a user's Internet session data. (NOB 7). Instead, the claims cover "extracting content" from a user's Internet session based on an ambiguous set of predefined rules. (Appx79, 4:9-17).

## B.  NICE's Description Of Prior Art Methods Of Monitoring The Internet Is Not Supported By The Record

To bolster the three new "technological challenges" allegedly addressed by the '955 patent, NICE relies on three prior art references, which are not part of the appellate record, and argues that when the '955 patent was filed in 2011, "the ability to monitor a user's interactions with the Internet and make meaningful use of the resulting information was constrained by technological hurdles." (NOB 7). While Google, Amazon and numerous other Internet companies would likely dispute the accuracy of this statement, NICE's prior art evidence and arguments are not properly before this Court, and its characterization is at odds with how the Examiner read each reference.

1.    **The *Costigan* Reference**

NICE alleges that the system disclosed in U.S. Patent Application No. 2002/0083167 to Costigan *et al.* ("Costigan") "lacks the ability to extract specific data from or interpret the content of the webpages that the user is viewing." (NOB 9). According to NICE, the sales agent in Costigan monitors a user's Internet interactions through a "frame set" but only when the "user lingers on a particular webpage for some set period of time." (*Id.* 8-9). Additionally, NICE alleges that Costigan is "unable to analyze or derive value from the user's interactions with other webpages" and is only able to generate a recommendation based on "whatever message the sales agent chooses to convey based on his or her observation and judgment." (*Id.*)

The Examiner did not read Costigan as having these problems. Instead, the Examiner found Costigan discloses a "processor to extract content from Internet server traffic according to predefined rules" including the title of a webpage and search words used by the customer. (Appx425, ¶14). Contrary to NICE's assertion, the Examiner did not find that the sales agent is limited to tracking the user's browsing history through a "frame set," as Costigan discloses a "passive sniffing device" that can interpret and capture the entire content of the webpages viewed by the user while the user is browsing. (Appx425, ¶9, Appx425, ¶11). The Examiner did not find that Costigan limits the method to extracting content only

after a user has lingered on a webpage for a particular set period of time. (Appx423-428). The message conveyed by the sales agent is based on a "description of the customer's interactions, product viewed, and prices offered"— not just whatever the agent "chooses to convey." (Appx424, ¶7; NOB 9).

### 2.   **The *Mancisidor* Reference**

NICE alleges that the recommendations generated by U.S. Patent Application No. 2007/0208682 to Mancisidor *et al.* ("Mancisidor") "are not based on the web-browsing activity of the customer, but instead on the 'customer's answers' to 'a set of questions relating to the needs of the customer.'" (NOB 10). According to NICE, the method disclosed in Mancisidor does not use the Internet "to collect the data or to make [the] recommendations." (*Id.*)

While Mancisidor only discloses generating recommendations based on a customer's answers to questions relating to the customer's needs, NICE ignores that the Examiner viewed Mancisidor in combination with Costigan, not in isolation, and found that the references together disclose generating recommendations based on a user's Internet sessions. Specifically, the Examiner found that Mancisidor, in combination with Costigan, teaches automatically analyzing the user's Internet interaction, generating a recommendation, and providing the recommendation to a call center agent during a telephone call initiated by the user. (Appx433, ¶3, Appx435, ¶14, Appx436, ¶17).

8

### 3.    The *Vincent* Reference

NICE argues that U.S. Patent Application Publication No. 2002/0087385 to Vincent ("Vincent") discloses a system whereby "a call center agent makes a recommendation to a specific customer, based on that customer's past Internet usage history, to repeat the same web-browsing activity in which the customer engaged in the past."  (NOB 12).  The Examiner did not find that Vincent limits the recommendation to suggesting that the user "repeat the same web-browsing activity."

The Examiner did find, however, that Vincent discloses "automatically analyzing, by a web analyzer (e.g., data analysis tools [] and recommendation engine []) using a processor, the user's Internet interaction to generate a recommendation for guiding the user's Internet interaction" and "providing the recommendation on screen to a contact center agent . . . while the contact center agent is communicating with [the] user during a telephone call initiated by the user."  (Appx444-445, ¶4).  The Examiner also found that Vincent discloses "a storage device . . . to store the user's Internet interaction" and a "telephone call between the contact center agent and the user [] triggers the processor to send the contact center agent the recommendation."  (Appx447-448, ¶15, Appx448, ¶18).

9

**C.**    **The '955 Patent**

**1.**    **Representative Claim Of The '955 Patent[1]**

Claim 1 recites:

1.    A method for monitoring a user's interactions with Internet-based programs or documents, the method comprising:

**extracting** content from Internet server traffic according to predefined rules;

**associating** the extracted content with one or more of a user's Internet interaction sessions;

**storing and indexing** the user's Internet interaction sessions;

**automatically comparing**, by a web analyzer using a processor, one or more of the user's Internet interaction sessions to one or more modeled sessions to generate a recommendation of one or more future session paths from the modeled sessions for guiding the user's Internet interactions; and

**providing the recommendation** of the future session paths from the modeled sessions on screen to a contact center agent while the contact center agent is communicating with said user during a telephone call initiated by the user between the agent and the user.

(Appx108, 61:32-50 (emphasis added)).

The claims broadly describe a method for extracting data, associating the data with a particular user, storing the data and indexing it to correspond to the user, comparing the extracted data to "modeled sessions," and generating a recommendation for a future Internet session path.  The first three limitations

generally describe gathering data from one channel, associating the data with a user, and storing and indexing the data for that user.  The fourth limitation claims using a generic "web analyzer using a processor" to compare the data to "modeled sessions" to create a recommendation.  (*See infra* at 17-19 (discussing modeled sessions)).  The last limitation claims providing the recommendation to a call center agent while the agent is on the phone with the user.

NICE mischaracterizes Claim 1 as covering an "optimal path of webpages for a user to visit during a future Internet session" (NOB 2) or "an optimal future Internet interaction session." (*Id.* 14).  NICE broadly cites to the summary of the invention and Claim 1, but ignores the language of Claim 1 itself, which does not optimize anything but only provides "a recommendation of one or more future session paths."  (*Id.* 2 (citing Appx78, 1:47-57; Appx108, 61:32-50)).

### 2.    The Written Description Of The '955 Patent

The '955 patent is generally directed to the idea of cross-channel customer service, *i.e.*, gathering customer information from one communication channel and using it to engage the customer via another communication channel.  (Appx78, 1:16-19 (customer service can include "provid[ing] technical support, sell[ing] products or schedul[ing] appointments")).  Mirroring the language of Claim 1, the "Summary of the Invention" identifies the basic idea covered by the '955 patent as:

---

[1]    The parties agree that Claim 1 is representative.  (NOB 19).  This brief thus

> A device, system and method [that] is provided for monitoring a
> user's interactions with Internet-based programs or documents.
> Content may be extracted from Internet server traffic according to
> predefined rules. Extracted content may be associated with a user's
> Internet interaction. The user's Internet interaction may be stored and
> indexed. The user's Internet interaction may be analyzed to generate a
> recommendation provided to a contact center agent while the contact
> center agent is communicating with said user, *e.g.*, in real-time, for
> guiding the user's Internet interaction. Traffic other than Internet
> server traffic may also be used.

(*Id.* 1:47-57). The specification states that the "problem" solved by the '955 patent

was improving a customer service process when "customers use multiple different

channels of communication, such as the internet and call centers." (*Id.* 1:30-32).

The specification describes that if a customer browses the Internet and then calls a

call center agent to make a purchase, the call center agent "has no information

about the customer's Internet sessions," leading to a "slow and unreliable process."

(*Id.* 1:36-43). As another example, the '955 patent describes how it may be

"frustrating" for a customer if she is matched with a different call center agent each

time she calls a call center because it may be "inefficient" if the customer has to

repeat her information. (*Id.* 1:16-29).

The '955 patent describes the basic solution to this problem as "'cross-

channel' analysis" in which "a web summary of a user's online (e.g., Internet or

web) session may be retrieved upon receipt of an incoming call from the same

---

analyzes Claim 1 as representative of all asserted claims.

user." (Appx79, 4:43-47). When the contact center agent receives a user's call, "based on the user's past or current web interactions," the agent can then offer "up-sell or cross-sell options" to that user. (Appx91, 28:34-41).

The written description of the '955 patent, however, does not "describe[] in detail the structure, operation, and arrangement of various components of the claimed invention" as NICE claims. (NOB 14). Rather, NICE's citations to the specification confirm that the claimed elements of the '955 patent are described in functional and results-oriented terms. (*See id.* 15-19). For example, NICE says the "web capture server" includes a passive sniffing device that "capture[s], in real time, user traffic 'across the Internet'" but neither NICE nor the specification provide details for how the capture is done. (*Id.* 15). Similarly, NICE offers no explanation for  the working of  "analysis server" or "web analyzer" that extracts data  and "analyze[s] the data, identif[ies], filter[s], save[s] or extract[s] interesting elements" (*Id.* 16), and the "interactions database" that stores and indexes the Internet interaction sessions (*Id.* 17). Simply put, the written description does not provide any specific details about the "structure, operation, and arrangement" of the claimed elements, but instead, just like the claim language, states, in general terms, their functions and purpose.

### 3.    The Prosecution History Of The '955 Patent

In the first Office Action, the '955 patent was rejected as being anticipated and obvious in view of Costigan.  (Appx423).  The Examiner explained that Costigan taught each of the elements claimed in the '955 application, including "extracting content from Internet server traffic," "associating extracted content with a user's Internet interaction," "storing and indexing the user's Internet interaction," and "analyzing the user's Internet interaction to generate a recommendation provided to a contact center agent" while the agent is communicating with the user.  (Appx423, ¶2).  To overcome the Examiner's finding, NICE amended the claims.  Specifically, NICE added a new limitation that the recommendation be provided "on screen" to the contact center agent and "during a telephone call initiated by the user between the agent and the user." (*See* Appx510-511).    NICE also narrowed the "analyzing" step by adding "automatically."  (Appx510).

 In a second Office Action, the Examiner again rejected the claims in the '955 application as being obvious over Costigan in view of Mancisidor. (Appx432).  The Examiner found it would have been obvious to incorporate the recommendation feature disclosed in Mancisidor with the methods of monitoring a user's interactions with the Internet disclosed in Costigan.  (Appx433, ¶3).

To overcome the Examiner's rejection and the Costigan and Mancisidor combination, NICE added a "web analyzer using a processor" to the "analyzing step" in Claim 1. (Appx521). NICE specified that the claimed system must "automatically analyze the user's Internet interaction by executing a web analyzer." (Appx522). NICE also limited then-claim 5 to "generating a summary of the user's past or current Internet interactions and providing said summary to the contact center agent." (Appx521). By amending the claims in this manner, NICE conceded that the only difference between the '955 application and Mancisidor is the addition of a web analyzer.

In a third and final Office Action, the Examiner rejected the amended claims as being obvious over Costigan in view of Vincent. (Appx444). The Examiner found it would have been obvious to incorporate the web analyzer of Vincent into the methods disclosed by Costigan "as a way of using a rules engine to determine patterns in a customer's multi-channel interactions with a business and to suggest interaction strategies for a current interaction based upon the observed patterns." (Appx445, ¶4; Appx447-448, ¶15). The Examiner also found it would have been obvious to incorporate the "storage device" disclosed in Vincent "to store the user's Internet interaction" (Appx447-448, ¶15) and a "telephone call between the contact center agent," whereby "the user telephone triggers the processor to send the contact center agent the recommendation." (Appx448, ¶18).

15

To overcome the Examiner's third rejection, NICE added narrowing limitations to specify that the recommendation provided to the call center agent is made by "comparing . . . one or more of the user's Internet interaction sessions to one or more modeled sessions to generate a recommendation of one or more future session paths from the modeled sessions." (Appx453-454).[2] NICE further amended the claims so that the recommendation provided to the call center agent would include a recommendation "of the future session paths from the modeled sessions." (*Id.*). NICE also changed "interactions" to "interaction sessions" and claimed "using a web player" to provide the call center agent with a playback of the user's Internet interaction sessions when the agent and the user are communicating over the telephone. (*Id.*). As discussed below, the only description provided for the "modeled sessions" limitation in the specification describes it as "generated in a computer-training environment by a computer programmer or trainer." (Appx80, 5:15-17; *see infra* at 17-19).

NICE did not amend the claims during prosecution to "overcome [] technological challenges inherent in tracking and analyzing interactions with the Internet" that were not solved by the prior art. (NOB 21). NICE amended the claims because the Examiner found them anticipated and obvious baased on the

---

[2]   The Examiner did not distinguish between claims that "compare" the extracted user information and claims that "analyze" a user's Internet interactions. (NOB 18 n.5 (citing Appx453)).

prior art methods for tracking and analyzing a user's interactions with the Internet. (*See generally* Appx423-450).  To overcome this admitted prior art, NICE added a series of narrowing amendments that limited the invention to systems and methods that compare a user's interactions with the Internet "to one or more modeled sessions." (Appx458 (distinguishing the '955 application, as amended, from Vincent because Vincent "did not disclose comparing the customer's interaction session to one or more modeled sessions")).

**D.    NICE's Claim Construction Of "Modeled Sessions" Is Not Supported**

NICE's claim construction for the term "modeled sessions" and its characterization of the specification's teaching is not reflective of how this coined term is used.  "Modeled sessions" is only mentioned **once** in the specification, where it is described as "generated in a computer-training environment by a computer programmer or trainer." (Appx80, 5:15-17).  Thus, this term is specifically defined as a recommendation generated by a person, not a computer.

However, NICE now construes "modeled sessions" as "complex algorithmic machine learning tools built using data aggregated from 'real-life session summaries generated by other satisfied customers'" and "'retrieved from a pool of session histories.'"  (NOB 49).  The portions of the specification cited by NICE describe "ideal histories"—not "modeled sessions." (*Id.* 17 (citing Appx80, 5:9-17); *id.* 49 (citing Appx80, 5:13-20)).  It is the "ideal histories" that may be "fixed,

e.g., including a linear path of webpages to browse, or dynamic, e.g., including tree-structured or matrix paths, where each chosen webpage path leads to different options, and thus different outcomes." (*Id.* 17-19 (citing Appx80, 5:20-24)). And it is the ideal histories that can be used "to predict optimal future session paths to recommend to the customer." (*Id.* 18 (citing Appx80, 5:9-13)). Indeed, the specification makes it clear that "ideal histories" and "modeled sessions" are separate and distinct concepts:

> The ideal histories may be based on real-life session summaries generated by other satisfied customers ***or may be modeled sessions*** generated in a computer-training environment by a computer programmer or trainer.

(Appx80, 5:13-17) (emphasis added). NICE's claim construction of the "modeled sessions" limitation finds no support in the specification.

Further, when asked by the district court whether NICE was relying on any particular claim construction, NICE's counsel responded "No. There is no specific claim construction." (Appx581, 13:22-25). Instead, as noted by the court, NICE made the vague statement that this term reflected "computer constructs that associate certain web interactions with particular outcomes." (Appx18 (citing Appx581, 13:3-4). While NICE has now shifted positions on the meaning of this claim term which it added to overcome the prior art, the specification clarifies that "modeled sessions" reflect the inherently abstract concept of a human recommendation for a future Internet session.

18

**E.**    **The District Court Determined That The Claims Are Directed To An Abstract Idea**

NICE's description of the district court decision is incomplete and at times argumentative. (NOB 24-27). Accordingly, ClickFox provides the following summary of that decision to correct NICE's characterization.

The district court found that the claims of the '955 patent are directed to the abstract idea of "cross-channel customer service, i.e., gathering customer information from one communication channel and using it to engage the customer via another communication channel." (Appx7). Citing to the language of the claims and specification, the court found that the problem presented and solved by the invention of the '955 patent was "maintaining a consistent customer experience across different communications channels," and that the recited claim limitations only provide a generic environment (*i.e.*, the Internet) in which to carry out this abstract idea. *Id.* Contrary to NICE's characterization that the district court ruled without specifically addressing all of the claim language, the district court analyzed each claim limitation in conjunction with its analysis of other decisions from this Court directed to similar economic practices and using similar data gathering and manipulation steps. (Appx7-8).

Next, the district court used an analogy to show how the claims, when properly stripped of generic computer components and limitations to the particular technological environment, are directed to an abstract idea. Specifically, the

19

district court showed that a car salesman could (1) extract content from a communication with a customer, (2) associate the content with the customer, (3) store the content in a file, (4) compare the customer's information to that of other customers' to generate a sales recommendation, and (5) when the customer called back, a second salesman could provide the recommendation after pulling the customer's file. (Appx9). The court found that the only difference between the claims and this car salesman analogy is "the use of automation via generic computer components to increase efficiency." (*Id.*).

Next, the court *sua sponte* addressed this Court's decision in *Enfish*, which was decided after the oral argument in the underlying action. (Appx10 (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016)). The court held that the claims of the '955 patent were unlike those in *Enfish* because the claims of the '955 patent do not reflect an improvement in computer capabilities and instead claim an abstract idea (i.e., cross-channel customer service) for which computers are used merely as a tool. (*See id.*). The court noted that NICE's arguments "essentially parrot the claim language" and that NICE did not point to anything that could "conceivably constitute an advance or improvement in technology for performing the method." (Appx10-11).

**F.**    **The District Court Determined That The Claims Lack An Inventive Concept**

At *Alice* step two, citing extensive precedent from this Court, the district court considered each of the limitations individually and as an ordered combination before concluding that the claims did not add an inventive concept to the abstract idea of cross-channel customer service.  (Appx12-19).

Specifically, the court outlined five reasons why the claims lacked an inventive concept.  (*Id.*).  First, the district court found that the claim limitations of the representative claim of the '955 patent were "merely directed to using generic computer components to add efficiency and speed to the abstract idea of cross-channel customer service."  (Appx12-13).  The court noted that a "web analyzer using a processor," simply referred to "using a generic processor to speed up an analytical process."  (Appx13).  The court also discussed "modeled sessions."  (*See infra* at 23).  The court relied on decisions from this Court, including *Electric Power Group*, decided after oral argument, which have repeatedly held that using a computer to speed up a fundamental business practice does not amount to an inventive concept.  (*Id.*; *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016)).

Second, the court rejected NICE's repeated attempts to render the problem addressed by the '955 patent one "rooted in computer technology" or specific to the Internet.  (Appx14-16).  The court emphasized that it was NICE that limited the

'955 patent to a specific technological environment—the Internet—not any problem inherent in cross-channel customer service. (*Id.*). As discussed above, NICE did not present any of its three new "technological challenges" which it presents on appeal to the district court, so the district court could not, and did not, consider these arguments. (*See supra* at 4-6).

The court properly considered the claim limitations as an ordered combination, finding that limiting the claims to gathering information from the Internet and then communicating a recommendation via a call center agent did not provide an inventive concept. (Appx15). Relying on this Court's precedent, the court noted that the asserted claims as a whole merely took "the abstract idea of cross-channel customer service, and limit[ed] it to a specific context . . . where the customer browses the Internet and subsequently calls a business's contact center." (Appx16). The fact that the court did not recite the words "ordered combination" verbatim in its opinion does not mean that it did not consider the claims together in this manner, as NICE alleges. (NOB 57-58).

Third, citing the claims and specification, the court noted that neither "provide[d] any technical explanations as to how any of the various computer components function or provide the desired efficiency, but instead resort[ed] to vague, functional descriptions of the components." (Appx17). The court *sua sponte* analogized the claims to those in *Electric Power Group* and *In re TLI*, both

decided after oral argument, to find that the claims were "so result-focused, so functional" that they would "effectively cover any solution to [the] identified problem."  (*Id.*; 830 F.3d 1350 (Fed. Cir. 2016); *In re TLI Communs. LLC Patent Litigation*, 823 F.3d 607 (Fed. Cir. 2016)).

Fourth, the court addressed the "modeled sessions" limitation of the claims and found that it did not add an inventive concept to the otherwise ineligible abstract idea of cross-channel customer service. (Appx17).  The court found that at most, it amounted to "no more than making a basic statistical inference, or prediction of future behavior based on available data," which "certainly does not add an inventive concept to the claimed abstract idea."  (Appx17-18).

Finally, the court held that the asserted dependent claims made only "minimal additional contributions" and therefore did not add anything "even arguably inventive" to the otherwise ineligible independent claims.  (Appx18).

## SUMMARY OF THE ARGUMENT

The district court properly concluded that the asserted claims are invalid because they fail to recite patent-eligible subject matter, and its judgment should be affirmed.  The claims of the '955 patent are directed to the basic and well-known business concept of cross-channel customer service – *i.e.*, gathering customer data from one communication channel and providing a recommendation to a customer through another channel.  This finding is supported by the plain claim language,

specification, and prosecution history of the '955 patent. Even if NICE's newfound arguments regarding "technological improvements" and its related new evidence are considered on appeal, the claims do not recite an improvement to computer functionality and do not solve a problem particular to the Internet.

The claim limitations – either individually or as an ordered combination – do not include an inventive concept because they merely claim conventional computer elements for extracting, associating, storing, and comparing data, which have consistently been found by this Court as not providing an inventive concept. As a result, they broadly preempt the integrated sales and customer service approaches of most modern businesses. Thus, the asserted claims lack sufficient inventive concept to transform them into patentable subject matter.

## ARGUMENT

### A.    Standard Of Review

Pursuant to Federal Circuit Rule 28(b), ClickFox expands upon NICE stated standard of review as follows. The validity of the '955 patent under § 101 is a "threshold" issue for a court to decide as a matter of law. *See, e.g.*, *Bilski v. Kappos*, 561 U.S. 593, 602 (2010); *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014). This Court has repeatedly affirmed orders finding patents invalid under § 101 on a motion to dismiss or a motion for judgment on the

pleadings. *See, e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1351 (Fed. Cir. 2014).

## B.    NICE's Principal Brief Includes Newly Presented Theories And Evidence Which This Court Should Decline To Consider

NICE, for the first time on appeal, presents new theories and evidence which were not presented to the district court. These new theories and evidence should not be considered on appeal.

### 1.    NICE's Newly Presented Theories Should Not Be Considered By This Court

This Court's precedent is clear: A party may not make new arguments or lodge new theories on appeal. *See, e.g.*, *Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("[A]ppellate courts do not consider a party's new theories, lodged first on appeal."); *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008) ("Our precedent generally counsels against entertaining arguments not presented to the district court."); *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006) ("[A] party may not introduce new [] arguments on appeal or alter the scope of the [] positions it took below.")[3]; *Finnigan Corp. v. United States ITC*, 180 F.3d 1354, 1363 (Fed. Cir.

---

[3]    There are a limited set of circumstances in which this Court will consider arguments presented for the first time on appeal. *Yufa v. TSI, Inc.*, 600 Fed. Appx. 747, 753 (Fed. Cir. 2015). None of these circumstances are present here, and even if they were, NICE makes no argument to this effect, so there is no basis to consider the new arguments.

1999) ("A party's argument should not be a moving target."). Despite this directive, NICE's opening brief asks this Court to consider theories and arguments that it did not present in the district court proceedings.

In the lower court, NICE argued that the "problem" the '955 patent addressed was "how to provide call center agents (who only have access to customer service systems) with useful information about users' Internet session information (which is not available in customer service systems)." (Appx495). Stated in NICE's own words, the problem was that "'variability may be introduced when customers use multiple different channels of communication, such as the Internet and call centers, for customer service,'" in which case "'agents contacted via one channel may have no way to track a customer's history across another channel.'" (Appx486 (citing Appx78, 1:30-32, Appx78, 1:39-43)). At oral argument, NICE's counsel again described the problem addressed by the '955 patent "as providing a real-time recommendation to a customer service agent based on analysis of web interactions, using that web analyzer." (Appx583, 15:2-5).

On appeal, and for the first time, NICE's presents a new theory regarding the problem solved by the '955 patent, including three "technological challenges."

(NOB 5-7, 42-44). These challenges must be rejected both procedurally and substantively.[4]

Procedurally, these theories fail because NICE did not present any of them to the district court. These new theories (which are unsupported by the '955 patent specification) directly contradict NICE's theories in the district court. NICE has not given the Court any reason why it could not have raised these theories during the district court proceedings. NICE cannot now, on appeal, "choose to make its arguments in iterative fashion, raising a new one on appeal after losing on its other at the district court." *Golden Bridge Tech., Inc.*, 527 F.3d at 1323. Because these theories were never presented to the district court, the Court should not consider them – or arguments flowing from them – on appeal.

Further, NICE also now raises on appeal a new claim construction issue for the "modeled sessions" limitation, arguing that "[m]odeled sessions are complex algorithmic machine learning tools," (NOB 49) after failing to raise any claim construction issues at the district court. (*See supra* at 17-19; Appx581, 13:22-25). NICE's attempt to have this Court engage in claim construction, after expressly

---

[4] Substantively, these theories must be rejected because the claim does not address, and the specification does not identify, any of these three new challenges as "problems" – much less technological problems – overcome by the '955 patent. The three new "problems" are further discussed and rebutted in pages 4-6, *supra*.

waiving claim construction at the district court, prevents orderly adjudication of the issues.[5]

Anticipating NICE's reply that its theories about "technological challenges" and construction of modeled session are similar enough to its lower court arguments to be preserved – this Court has rejected such arguments in the past and should do so again here. *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) ("If a party fails to raise an argument before the trial court, or presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal, and we do so here."). Because NICE's new theories on the alleged "technological challenges" solved by the '955 patent and the proposed claim construction of "modeled sessions" were not presented to the district court, the Court should deem them, and any argument relying on them, waived.

## 2.     NICE's Newly Presented Evidence Should Not Be Considered By This Court

The record on appeal is limited to the evidence that was presented to the district court. *Moore U.S.A., Inc. v. Std. Register Co.*, 229 F.3d 1091, 1115-16 (Fed. Cir. 2000) ("[W]e note that the record on appeal is generally limited to that which was before the district court."). As a result, this Court "does not 'review' that which was not presented to the district court." *Sage Prods.*, 126 F.3d at 1426;

---

[5]  *See supra* pp. 17-19 (discussing limited disclosure of modeled sessions).

*Phonometrics, Inc. v. Westin Hotel Co.*, 319 F.3d 1328, 1333 (Fed. Cir. 2003) ("We, as a court of review, generally do not consider evidence that has not been considered by the district court.").

In addition to its new legal theories, NICE's opening brief includes evidence presented for the first time on appeal. Specifically, NICE cites the following evidence, which was not presented to the district court or entered into the record: (1) pages and figures from Costigan (NOB 8-9), Mancisidor (*id.* 9-10), and Vincent (*id.* 11-13, 48); (2) U.S. Patent 7,035,926 to IBM and U.S. Patent 7,958,234 to Yahoo! (*id.* 5); (3) an Internet article (*id.* 21); and (4) two webpages (*id.* 23).

While office actions addressing Costigan, Mancisidor, and Vincent were introduced and considered by the district court, the patents were not part of the record below. Similarly, the Examiner considered the IBM and Yahoo! patents as "pertinent to applicant's disclosure" in the first office action but expressly did not rely upon the patents for a rejection. (Appx427, ¶22). These patents were never considered by the district court and are not part of the appellate record. The other listed evidence similarly was not presented below.

Now, NICE offers this evidence to argue—contrary to the specification and its statements to the district court—that the '955 patent addresses three technological challenges associated with tracking a user's interactions with the

Internet that were not solved by the prior art.  (NOB 28-39).  NICE has not given

the Court any reason why it could not or did not present this evidence to the district

court, or why this Court should consider the evidence for the first time on appeal.

*See HTC Corp. v. IPCom GmbH & Co.*, 417 Fed. Appx. 976 (Fed. Cir. 2011)

(denying motion for judicial notice where patents "were not presented to the

district court for its consideration, and thus the appellees did not have the

opportunity to respond in the district court"); *Moore U.S.A., Inc.*, 229 F.3d at 1116.

The Court should disregard the new evidence presented by NICE on appeal

because it was never presented to the district court or entered into the record.

### C.    Abstract Ideas Are Not Eligible For Patent Protection Unless They Claim an Inventive Concept

The Supreme Court has long recognized that Section 101 excludes certain

subject matter from patent eligibility, including laws of nature, natural phenomena,

and abstract ideas.  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.

Ct. 1289, 1293 (2012); *see also Bilski*, 561 U.S. at 601.  The Supreme Court has

set forth a two-part framework for analyzing patent eligibility.

First, the court asks "whether the claims at issue are directed to one of those

patent-ineligible concepts"—e.g., an abstract idea.  *Alice Corp. Pty. Ltd. v. CLS*

*Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).  An abstract idea does not become patent

eligible by limiting it to a particular technological environment, such as the

Internet.  *Id.* ("limiting the use of an abstract idea 'to a particular technological

environment'" is "not enough for patent eligibility") (quoting *Bilski*, 561 U.S. at 610-11).

Second, if the claim is directed to an abstract idea, the court must then "search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294) (brackets in original). Simply taking an abstract idea and adding steps that involve "well-understood," "routine," or "conventional" activities contributes nothing inventive to an otherwise abstract idea. *Mayo*, 132 S. Ct. at 1294, 1299. "[T]he essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101." *Elec. Power Grp.*, 830 F.3d at 1356.

**D.    The '955 Patent Claims Fail To Recite Patent-Eligible Subject Matter**

**1.    Step One:  The '955 Patent Claims Are Directed To The Abstract Idea Of Cross-Channel Customer Service**

**a.    The '955 Patent Claims A Method For Cross-Channel Customer Service**

The Supreme Court has held that claims directed to fundamental economic practices, without an inventive concept, are not patent-eligible. *Alice*, 134 S. Ct. at 2356-57; *Bilski*, 561 U.S. at 611 (2010) (holding concept of risk hedging was abstract because it was a "fundamental economic practice long prevalent in our

system of commerce"). This Court has likewise held that a variety of other basic business and economic concepts constitute abstract ideas under Section 101. *See, e.g.*, *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) (offer-based price optimization); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014) (using advertising as a currency on the Internet); *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed. Cir. 2014) (guaranteeing the performance of a transaction); *LendingTree, LLC v. Zillow, Inc.*, 656 Fed. Appx. 991, 996 (Fed. Cir. 2016) (speeding up the process of obtaining a loan on the Internet); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-68 (Fed. Cir. 2015) (tracking financial transactions to determine whether they exceed a pre-set spending limit); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371-73 (Fed. Cir. 2011) (verifying credit card transactions over the Internet).

The claims at issue are similarly directed to fundamental economic practices and are not eligible for patent protection under Section 101. The patent itself describes the invention as relating to speeding up a customer service process using computers and the Internet to gather customer data across multiple channels of communication. (Appx78, 1:16-57). Specifically, the specification describes the "variability" that "may be introduced when customers use multiple different channels of communication, such as the Internet and call centers for customer

service." (*Id.* 1:30-32).   When a user browses the Internet and then calls the call

center to make a purchase, the call center agent "has no information about the

customer's Internet sessions," leading to a "slow and unreliable process."  (*Id.*

1:36-43).   The '955 patent also describes how it may be "frustrating" for a

customer if she is matched with a different call agent each time she calls a call

center because it may be "inefficient" if the customer has to repeat her information.

(*Id.* 1:16-29).

Representative claim 1 describes the basic idea of cross-channel customer

service with five steps: (1) extracting content related to an Internet user's online

interactions; (2) associating the extracted content with the user; (3) storing and

indexing the user's Internet interactions; (4) automatically comparing one or more

of the user's Internet interaction sessions to a modeled session to generate a future

recommendation; and (5) providing the recommendation to a contact center agent

while that agent is communicating with the user during a telephone call.   This

claim, through these five generic data-gathering and data analysis limitations,

covers the basic and well known business concept of providing a customer

recommendation by collecting customer data from one communication channel

(the Internet), analyzing the data, and providing a customer recommendation when

the same customer communicates over another channel (the phone).   The district

court thus properly held that the claims were directed to the abstract idea of cross-

channel customer service, which is "certainly 'a fundamental economic practice long prevalent in our system of commerce.'" (Appx7).

b. **The Asserted Claims Are Directed To Cross Channel Customer Service, Not To Technological Improvements**

The crux of NICE's step one argument, in its own words, is that the asserted claim "recites a system that is directed to a particular way of monitoring a user's interactions with the Internet and utilizing those interactions." (NOB 33). In support, NICE argues that the preamble and "four out of the five claim elements" pertain to steps for "tracking and analyzing a user's interactions with the Internet." (*Id.*). NICE then concludes that the claim is not directed to an abstract idea and falls under the umbrella of *DDR* and *Enfish* as a patent eligible "technological improvement." (*Id.* 32-39). This argument is flawed because it ignores the claim language and specification of the '955 patent.

In an effort to avoid the full scope of the asserted claim, NICE ignores the fifth limitation of the claim – "providing the recommendation…while the contact center agent is communicating with said user during a telephone call initiated by the user between the agent and the user." Or at the least, NICE attempts to downplay the limitation's importance by characterizing it as "mere post-solution activity." (*Id.* 33). In making this argument, NICE's mischaracterizes this Court's discussion in *Enfish* and attempts to draw a distinction between claims which "involve" an abstract idea as opposed to claims which are "directed to" an abstract

idea.[6]  The relevant discussion in *Enfish* is that the "directed to" inquiry cannot simply ask whether the claims *involve* a patent-ineligible concept, because essentially every claim involves a law of nature and/or natural phenomenon. *Enfish*, 822 F.3d at 1335 (citing *Mayo*, 132 S. Ct. at 1293).  "Rather the 'directed to' inquiry applies a stage-one filter to claims, *considered in light of the specification*, based on whether 'their character as a whole is directed to excluded subject matter.'"  *Id.*  (citations omitted) (emphasis added).  Thus, to determine whether claims are "directed to" an abstract idea, the relevant inquiry involves review of *all* of the claim limitations and their character as a whole in light of the specification – not *some* ("four out of five") of the claim limitations in a vacuum.

A proper review of the full claim proves that it is directed to the fundamental economic concept of providing customer service by gathering customer data from one communication channel (the Internet) and providing a customer recommendation through another channel (the phone).  The claim does not cover an improvement in Internet technology, computer technology, computer networks, or the way computers function.

NICE tries to support its technological problem argument by throwing in a number of technical sounding concepts, like storing data "on a session-by-session

---

[6]  NICE seemingly admits that, even in light of its arguments, the asserted claim at least "involves" the concept of cross-channel customer service – as NICE defines "involves."  (Appx34).

Case: 17-1041    Document: 44    Page: 43    Filed: 03/23/2017

basis" (NOB 35), which are not claimed. Similarly, NICE bolsters this argument by citing the unsuccessful arguments it made during prosecution about the prior art, *e.g.*, that prior art Internet methods "were unable to extract useful data," which the Examiner did not accept because they were not true. (*Id.* 37). Finally, NICE improperly relies on the three technical problems first raised on appeal, *e.g.*, "the '955 patent claims systems and methods for harnessing massive and disparate user data from the web" (*id.* 37-38), that are not reflective of what is claimed or what is disclosed. At bottom, while NICE recites many times that its claims are not using "conventional computer activities" but "require specific technological components" that improve the prior art, (*e.g.*, *id.* 38), it does not identify a single claimed component that was not already a conventional way to monitor user activity on the Internet.

Further, in addition to ignoring the last limitation of the claim, NICE's argument ignores the specification. As discussed above, the specification plainly supports that the claims are directed to the abstract idea of cross-channel customer service. *See supra* at 11-13. In fact, NICE's brief cites to "alternative uses of the invention" in the specification which are similarly all directed to the broad and abstract idea of customer service. (NOB 33-34 (citing Appx80, 6:14-17 ("technical support, selling, 'up-selling' or 'cross-selling,' or filling in surveys"); Appx81, 7:46-48 ("Agents may provide users with customer support"); Appx108,

62:20-22 (dependent claim 10 for "technical support, selling, 'up-selling,' 'cross-selling,' or filling in surveys")).  Thus, when reviewed in full and considered in light of the specification, the claim is directed to the abstract idea of cross-channel customer service.

NICE's attempts to steer away from the relevant claim language in order to bring the claim within the protection of *DDR* and *Enfish*.  However, both cases are inapposite here.   In *DDR*, this Court found claims directed to generating a composite webpage were patent eligible because they "d[id] not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet."   *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).  This Court held that the claimed invention did not simply use computers to serve a conventional business purpose; instead, the invention was "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."  *Id.*   "In short, *DDR Holdings* dealt with a patent that required doing something to a web page, not simply doing something on a web page, a difference that the court regarded as important to the issue of patent eligibility."  *Affinity Labs of Tex. v. DIRECTV, LLC*, 838 F.3d 1253,1262 (Fed. Cir. 2016).

In *Enfish*, this Court held that when considering claims purportedly directed to "an improvement to computer functionality," this Court asks "whether the focus

of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1335-36.[7]

Neither is the case here.  The claim at issue here neither overcomes a specific problem arising in the realm of computer networks, nor solves an Internet-specific problem.  The five-step claim structure does not claim an improvement in computer or Internet technology as each step merely recites a routine function, like "extracting content," which was not a technical challenge in 2011.  Instead, as the district court properly found, the "claims here do precisely the opposite of the claims in *Enfish*."  (Appx10).  This finding is consistent with the claim language (*supra* at pp. 10-11), the specification (*supra* at pp. 11-14), and the prosecution history (*supra* at pp. 14-17).

NICE argues that the claim limitations (or, at least "four out of five") are directed to "a particular way of monitoring a user's interactions with the Internet and utilizing those interactions." (NOB 33).  This Court has consistently held that invoking the Internet, even when claim limitations specifically recite use of the Internet, is insufficient to save otherwise abstract claims.  *Ultramercial*, 772 F.3d at 716 (finding computer-implemented system for "using advertising as a currency

---

[7]  NICE mischaracterizes the district court's discussion of *Enfish,* which was proper and based on the unambiguous language of the *Enfish* decision.  (NOB 39 n.14 (citing Appx10)).

[on] the Internet" to be ineligible); *buySAFE*, 765 F.3d at 1352 (finding computer-implemented system for guaranteeing performance of an online transaction to be ineligible); *CyberSource*, 654 F.3d at 1370 (finding computer-implemented system for "verifying the validity of a credit card transaction over the Internet" to be ineligible).  The claims at issue similarly are directed to using the Internet for the abstract idea of cross-channel customer service – *i.e.,* tracking, associating, storing, and comparing consumer behavior on the Internet to provide customized recommendations.  *See infra* at 45-55 (at *Alice* step two, discussing individual claim limitations).

Finally, as the court properly recognized, the asserted claim and specification do not provide any technical explanations as to *how* any of the various computer components function or provide the desired results.  (Appx17) (citing cases).  Instead, they resort to vague, functional, and results-oriented descriptions of the claimed limitations.  *See infra* at 45-55 (discussing each limitation individually).  Critically, the claims and specification do not disclose any particular mechanism for solving the three new "technological challenges" posited by NICE on appeal.  *See supra* at 4-6 (discussing how claim language does not address the alleged three new "technological challenges").  Claims that disclose "a method for collection, analysis, and generation of information reports" but that "are not limited to how the collected information is analyzed or reformed, [are] the

39

height of abstraction." *Clarilogic, Inc. v. Formfree Holdings, Corp.*, No. 2016-1781, 2017 U.S. App. LEXIS 4769, at \*6 (Fed. Cir. Mar. 15, 2017). *See also Intellectual Ventures I LLC v. Erie Indem. Co.*, Nos. 2016-1128, 2016-1132, 2017 U.S. App. LEXIS 3982, at \*33-34 (Fed. Cir. Mar. 7, 2017); *Affinity Labs of Tex.*, 838 F.3d at 1265 (citing *Elec. Power Grp.*, 830 F.3d 1350)).

<h3 align="center">c.   <u>The District Court Analyzed The Asserted Claims In The Proper Context</u></h3>

NICE next argues that the district court did not give "meaningful consideration to [the claim's] technological requirements" and "oversimplified the claimed invention." (NOB 40). Essentially, NICE cherry picks portions of the opinion to say that the court did not appreciate the technical aspects of its invention, but in doing so, NICE relies on the three technological problems it never presented to the district court. Each of NICE's arguments is rebutted here.

First, the fact that the specific phrase "cross-channel customer service" is not in the patent is not of consequence to the Section 101 inquiry. (*Id.*). The claims in *Alice* did not expressly use the words "intermediated settlement." Instead, they set forth a series of steps that, when "viewed as a whole…simply recite[d] the concept of intermediated settlement as performed by a generic computer." 134 S. Ct. at 2359. In contrast, the '955 patent actually does use the word "cross-channel" customer interaction consistently throughout the specification. (*See, e.g.*, Appx78, 2:1-3 ("FIG. 1 schematically illustrates a system for monitoring a user's web or

40

cross-channel interactions…"); Appx79, 4:43-44 ("Customer interactions may be tracked using 'cross-channel' analysis."); Appx80, 5:5-7 ("[R]ecommendations may be based on the user's [] cross-channel web and/or call center history")). The patent also consistently uses and defines "customer service" as, for example, "to provide technical support, sell products, or schedule appointments." (*See, e.g.*, Appx78, 1:15-19). So unlike *Alice*, the '955 patent actually uses the specific words describing its abstract idea consistently throughout its written description. And like *Alice*, the '955 patent also claims a series of steps that, when viewed as a whole, simply recite the abstract concept as performed by a generic computer.

Second, the court did not ignore the claim language, and NICE does not explain what *exactly* it believes the court ignored. (NOB 40-41). In fact, the court set forth the relevant claim limitations (Appx5), identified and analyzed the limitations (Appx7-9), and addressed NICE's arguments to the contrary, which the district court found to be unavailing. (Appx10-11). The court's analysis is consistent with the test set forth by this Court, which is that "in analyzing step one, 'the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter.'" *FairWarning IP, LLC v. Iatric Sys.*, 839 F.3d 1089, 1094 (Fed. Cir. 2016) (quotation omitted).

Finally, the court further buffered its decision by setting forth an analogy proving that a human is capable of practicing the claim limitations, albeit

inefficiently.  (Appx9).  *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016).  NICE's criticisms of the district court's analogy are based on three new arguments never presented to the district court, none of which are supported by the specification, and should be rejected both procedurally and substantively.

**_First_**, NICE never argued any problem related to "massive amount[s] of data" in the lower court.  (NOB 42; *see supra* at 4-6).  Even assuming it did, however, the claims do not address this problem.  Specifically, the claim is not directed to monitoring, storing, and analyzing the Internet interactions of "millions of users." (NOB 6).  The claims of the '955 patent track and analyze a single user's Internet session to provide that user individualized feedback when the user contacts the call center agent.  (*See supra* at 4-6).  Thus, the call center agent in the '955 patent and the salesman in the district court's analogy are presented with the same problem:  the need for a faster, more efficient method of making recommendations to a customer.

**_Second_**, NICE never argued in the lower court any problem related to "fragmented and disparate" data or "an Internet user [who] navigates – often times erratically and across multiple browsing session" or "identifying and isolating – from massive and disparate data - Internet server traffic information that may have commercial significance." (*Id.* 42-43; *see supra* at 4-6).  Even assuming it did,

however, the claims do not address any of these problems.  The claims functionally claim extracting content related to an Internet user's online interactions according to pre-defined rules, associating the extracted content with the user, and storing and indexing the interaction data to generate a recommendation.  Moreover, both the claims of the '955 patent and the hypothetical salesman must overcome the same challenge of "identifying and isolating" which features have commercial significance to the customer.  (*Id.*).

**_Third_**, NICE never argued in the lower court any problem related to "ambiguous" data.  (*See supra* at 4-6).  Even assuming it did, however, the claims do not address this problem.  Nor is it clear that the customer's interests are "unambiguous" as NICE argues.  (NOB 43).  The claims do not provide any method for determining whether a consumer is "genuinely interested" or "has stepped away from his or her computer and forgotten to log off."  (*Id.* 7).  Nor does the '955 patent claim any method for "ask[ing] the customer directly" what information from the user's Internet session is relevant, which could clear up any ambiguity from the user's Internet browsing behavior.  (*Id.*).  Instead, the specification discloses extracting content from a user's Internet browsing session based on a number of parameters, including generic variables such as the amount of time a page is viewed and the items which are selected on a webpage.  (Appx79,

4:9-17). This extracted content is no more or less ambiguous than the salesman's evaluation of customer preferences.

At bottom, NICE's criticisms of the district court's decision should be rejected for two independent reasons, (1) they rely on theories never before presented to the district court, and (2) even when analyzed substantively, they are inconsistent with the claim language, which does not address any of the specific "problems" identified by NICE.

**2.    Step Two:  The Claims of the '955 Patent Do Not Add Inventive Concept To The Abstract Idea Of Cross-Channel Customer Service**

At *Alice* step two, NICE argues that "the claims recite web-based tools that operate in an unconventional manner" and thus add an inventive concept.  (NOB 45).  The fatal flaw in NICE's argument, however, is that it first admits that the claim recites "the very same components and processes [] recited in the prior art" then argues these prior art components "operate in a far different manner" because of what is taught in the specification.  (*Id.* 45-46).  The claims are broadly written and importing limitations from the specification into the claims is not allowed, dooming NICE's argument.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Further, the "modeled sessions" limitation, the only arguably inventive feature, does not add anything inventive to the abstract idea of cross-channel customer service because "modeled sessions" is itself an abstract construct.

### a.     The Asserted Claims Recite The Basic Concept Of Cross-Channel Customer Service Using Generic, Well-Known Elements

Having determined that a patent's claims are directed to an abstract idea, the court must ask whether the claims, considered individually and in combination, "do significantly more than simply describe th[e] abstract method." *Ultramercial*, 772 F.3d at 715; *Alice*, 134 S. Ct. at 2355 (the court should consider "the elements of each claim both individually and 'as an ordered combination'") (quoting *Mayo*, 132 S. Ct. at 1296-07).  However, "simply appending conventional steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable." *Mayo*, 132 S. Ct. at 1300.  Nor can "the mere recitation of a generic computer . . . transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358.

### (1)     The Individual Claim Limitations Recite Generic Computer Components And Processes

The claim at issue has five steps: (1) extracting content related to an Internet user's online interactions; (2) associating the extracted content with the user; (3) storing and indexing the user's Internet interactions; (4) automatically comparing one or more of the user's Internet interaction session to a modeled session to

45

generate a recommendation of a future Internet session path; and (5) providing the recommendation to a contact center agent while that agent is communicating with the Internet user during a telephone call. None of the asserted limitations contain an inventive concept that saves the '955 patent from ineligibility.

*__First__*, there is nothing innovative in the "extracting content" step. The claim requires removing content from a user's interactions with the Internet based on a set of rules, which is a basic task that has been performed on the Internet for decades. Based on the specification, NICE tries to resurrect what it admits is a conventional Internet task, by saying the content is extracted using "passive sniffing devices or probes" or possibly is based on the "presence or frequency of certain keywords." (NOB 46). Neither of these concepts is in the representative claim language, so both can be ignored. Moreover, NICE has no basis to contend that in 2011 using keywords to extract data was somehow innovative.

The Examiner found that this extraction concept was well-known in the prior art when the '955 patent application was filed and was anticipated by Costigan. (*See, e.g.*, Appx423 ¶¶1-2 (noting that Costigan discloses extracting selected content according to predefined rules)). While not dispositive, this is further evidence that the claim is "well-understood, routine [and] previously known to the industry." *In re TLI Communs.*, 823 F.3d at 614; *Affinity Labs of Tex.*, 838 F.3d at 1257 (whether a claim is patent eligible requires "look[ing] at the 'focus of the

46

claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter.").

This Court has consistently found similar claims directed to "merely selecting information, *by content or source*, for collection, analysis, and display" not sufficiently "differentiate[d] [] from ordinary mental processes" which are patent ineligible. *See Elec. Power Grp.*, 830 F.3d at 1355 (claims that perform conventional data collection steps using generic computer components "do[] not transform the otherwise-abstract process[] of information collection" into patentable subject matter) (emphasis added); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 2016-1077, 2017 U.S. App. LEXIS 3983, at *14, 21 (Fed. Cir. Mar. 7, 2017) (claims directed to the abstract idea of "collecting, displaying, and manipulating data" were not patent eligible); *Intellectual Ventures I LLC v. Erie Indem. Co.*, 2017 U.S. App. LEXIS 3982, at *22 ; *Content Extraction*, 776 F.3d at 1347; *CyberSource*, 654 F.3d at 1370.  The asserted claims, like those in *Electric Power Group*, do not even require any "new source or type of information" that could arguably satisfy the inventive concept requirement.  *Elec. Power Grp.*, 830 F.3d at 1355.  Thus, there is nothing inventive in this "extracting" step.

**<u>Second</u>**, the claimed "associating" step does not recite an inventive concept. Linking an Internet user with something they did on a previous Internet session can hardly be called innovative.  Recognizing this problem, NICE tries to argue the

claim covers "Internet interaction sessions" not "Internet browsing sessions," and thus covers more than "a list of web pages." (NOB 47). Again, NICE is neither describing the language of the claim, nor can it credibly claim that by 2011 Internet companies were only tracking web page visits.

This lack of inventiveness was confirmed by the Examiner who found that this associating step was anticipated by Costigan. (*See* Appx423, ¶2 (Costigan teaches "associating extracted content with a user's Internet interaction"), Appx425, ¶14 (same)). This Court has held that similar claims directed to classifying and associating data failed to recite an inventive concept. *See, e.g.*, *In re TLI Communs.*, 823 F.3d at 613-14 (claims directed to "classifying and storing digital images in an organized manner" did not contain an inventive concept); *Elec. Power Grp.*, 830 F.3d at 1355 (noting that "[m]erely requiring the selection and manipulation of information" does not transform otherwise abstract claims into patent eligible subject matter). Nor are the claims transformed into patent eligible subject matter simply because they are limited to a particular technological environment. *See In re TLI Communs.*, 823 F.3d at 614; *Ultramercial*, 772 F.3d at 716 ("[T]he use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101."). Thus, there is nothing inventive in this "associating" step.

_**Third**_, "storing and indexing" information gathered on a database or server is not an inventive concept. The claim requires taking the extracted Internet sessions and storing them on a database where they are indexed by user. NICE tries to save the claims by arguing that they cover the "use of an _**additional**_ database that stores and indexes 'Internet interaction sessions' _**after**_ the user data has already been partially analyzed and filtered" and that the extracted content is stored and indexed "on a session-by-session basis." (NOB 48-49) (emphasis in original). Neither of these features is described in the claim language and, even if they were, storing Internet data on a database and organizing the data in a particular manner would hardly have been innovative when the '955 patent was filed.

The Examiner came to the same conclusion when he rejected the claims as anticipated by Costigan, which similarly disclosed "storing and indexing the user's Internet interaction." (_See, e.g._, Appx423, ¶2). The Examiner also found that "a storage device [] to store the user's Internet interaction" was disclosed in Vincent. (Appx447-448, ¶15). Again, this is further evidence that the claim is "well-understood, routine [and] . . . previously known to the industry." _In re TLI Communs._, 823 F.3d at 614.

This Court's precedent confirms that claims directed to "storing and indexing" information on a database do not recite an inventive concept, especially

where the claims fail to set out any new technique or process for storing the extracted content. *See Elec. Power Grp.*, 830 F.3d at 1355-56 (claims that did not "require a new source or type of information" or claim any "new techniques" for storing information were not patent eligible because they did not "include any requirement for performing the claimed functions . . . by use of anything but entirely conventional, generic technology"); *Smartflash LLC v. Apple Inc.*, No. 2016-1059, 2017 U.S. App. LEXIS 3833, at *13 (Fed. Cir. Mar. 1, 2017) ("[M]erely storing, transmitting, retrieving, and writing data to implement an abstract idea on a computer does not 'transform the nature of the claim' into a patent-eligible application.") (citation and quotation omitted); *Content Extraction*, 776 F.3d at 1348 ("[l]imit[ing] the abstract idea of recognizing and storing information" using generic computer components performing well-understood activities is insufficient for patentability). Thus, there is nothing inventive in this "associating" step.

***Fourth***, "automatically comparing" one set of data to another set of data using a generic "web analyzer using a processor" is insufficient to provide an inventive concept. It was not innovative to compare one set of data to another set of data using a generic processor and web analyzer in 2011. Recognizing this problem, NICE argued that the claimed system was capable of "recommend[ing] a specific Internet browsing path that the user should follow during a future session"

50

and claimed that this capability was "entirely missing from conventional systems." (NOB 50).  NICE's citations to the file history does not support this assertion.

During prosecution, the Examiner rejected the '955 application as being obvious over Costigan in view of Vincent, which the Examiner found disclosed "automatically analyzing, by a web analyzer using a processor, the user's Internet interaction to generate a recommendation *for guiding the user's Internet interaction*." (Appx444, ¶4) (emphasis added).  Indeed, during prosecution, NICE amended the claims to substitute a "web analyzer" for what it claimed were prior methods of generating recommendations through "human surveillance." (Appx286).

This Court has consistently found similar claims relying on generic computer components to perform conventional and routine tasks faster and more efficiently than a human could patent ineligible.  *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d at 1315 ("'[C]laiming the improved speed or efficiency inherent with applying the abstract idea on a computer' does not 'provide a sufficient inventive concept'") (quotation omitted); *Intellectual Ventures I LLC v. Capital One*, 792 F.3d at 1367; *OIP Techs.*, 788 F.3d at 1363; *CyberSource*, 654 F.3d at 1372; *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1267 (Fed. Cir. 2012); *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012).

This leaves the only arguable inventive concept Claim 1 – the "modeled session." The modeled session – in and of itself – is an abstract concept. Indeed, the only use of the term "modeled session" in the specification says that it is "generated in a computer-training environment by a computer programmer or trainer." (Appx80, 5:15-17). Thus, the specification teaches *only* that a modeled session is (1) generated by a computer programmer or trainer, and (2) in a computer-training environment. At oral argument, consistent with the specification, NICE described the "modeled sessions" limitation as "computer constructs that associate certain web interactions with particular outcomes." (Appx581, 13:3-4). In its opening brief, however, NICE argues for the first time that "modeled sessions" are "complex algorithmic machine learning tools built using data aggregated from 'real-life session summaries generated by other satisfied customers'" and "'retrieved from a pool of session histories.'" (NOB 49).[8] NICE's specification citations, however, refer not to "modeled sessions," but to "ideal histories," and the specification explicitly provides that the two terms are different. (*See supra* at 17-19; Appx80, 5:13-24). Thus, NICE's new construction for "modeled session" has no support in the specification and should be rejected.

---

[8]  This new claim construction should not be considered by this Court. At the district court, NICE agreed that no claim construction was needed. As such, this is a new argument raised on appeal for the first time and should be rejected. *See supra* at pp.25-27.

The modeled session limitation, by itself, does not provide an inventive concept because it does not "require a new source or type of information, or new techniques for analyzing it." *Elec. Power Grp.*, 830 F.3d at 1355. The modeled session is a vague construct which only requires that it be "generated in a computer-training environment by a computer programmer or trainer." (Appx80, 5:15-18). The district court properly rejected NICE's arguments, finding that the "modeled sessions" limitation "do[es] not add any sort of inventive concept to transform the claims so as to be patent-eligible." (Appx17). *See also Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible."). Basing a patent on a process performed by a human is a boundless limitation and trying to limit it to the particular technological environment of "computer-training" does not make it any more patent eligible. *Alice*, 134 S. Ct. at 2358 ("limiting the use of an abstract idea 'to a particular technological environment'" is "not enough for patent eligibility" (quoting *Bilski*, 561 U.S. at 610-11)).

**_Fifth_**, "providing the recommendation" to a call center agent during a telephone call initiated by a customer is not an inventive concept. As NICE readily admits, giving a call center agent information to deliver to a customer while the

agent is on the phone with the customer was not innovative in 2011. (NOB 50). NICE tries to resurrect the limitation by arguing that it describes an "improved monitoring technology" that "enables a sales agent to make the recommendation in real time based on the customer's current Internet browsing, during a subsequent call initiated by the customer." (*Id.*). Again, the claim language of the '955 patent does not describe "improved monitoring technology." The Examiner found that this "providing a recommendation step" was not innovative, and rejected the '955 application as being obvious over Costigan in view of Mancisidor, which discloses providing a recommendation "on screen to a contact center agent while the contact center agent is communicating with [the] user during a telephone call initiated by the user." (Appx33, ¶3).

This Court has found similar claims relying on generic computer components to perform conventional and routine tasks faster and more efficiently than a human could – even in "real time" – patent ineligible. *See Elec. Power Grp.*, 830 F.3d at 1356 (claims directed to "specify[ing] what information . . . is desirable to gather, analyze, and display, including in 'real time'" were not patent eligible); *FairWarning*, 839 F.3d at 1097-98 (rejecting patentee's argument that claims directed to "collect[ing] and analyz[ing] disparate data sources in real time" contained an inventive concept); *Intellectual Ventures I LLC v. Capital One*, 792 F.3d at 1370 (claims limited to customizing a web page in "real time" based on

information known about the user did not recite an inventive concept). Thus, there is nothing inventive in the "providing a recommendation step."

### (2)    The Ordered Combination Of The Claim Limitations Operates In A Conventional Manner

The "ordered combination" prong asks whether the limitations, "as an ordered combination," add an inventive concept that is not already present when considered separately. *Alice,* 134 S. Ct. at 2355. In applying this "ordered combination" analysis to computer-implemented inventions, this Court has explained that patent limitations taken together as an ordered combination that "simply instruct the practitioner to implement the abstract idea with routine, conventional activity" are not patent-eligible subject matter. *Ultramercial*, 772 F.3d at 715-16.

The ordered combination of claim limitations in the '955 patent does not reflect any inventive concept because the limitations recite generic components, arranged in a conventional manner, to carry out routine activities on a computer. The first three claim limitations – extracting content, associating the extracted content with a user, and storing the extracted content – taken together recite "routine, [and] conventional" data collection and data gathering steps that do not make the claims patent eligible. *Mayo*, 132 S. Ct. at 1299; *Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these

functions."). Using the Internet or a generic computer to carry out these basic data collection and data gathering steps in an ordered combination does not add an inventive concept. *See Ultramercial*, 772 F.3d at 716; *CyberSource*, 654 F.3d at 1370; *Clarilogic, Inc.*, 2017 U.S. App. LEXIS 4769, at *7.

Taken together with the remaining claim limitations – comparing a user's session to modeled sessions using a web analyzer and generating a recommendation – the claim as a whole is directed to the predictable recitation of gathering and analyzing data using generic processors and systems. The claims do not recite a method or system which deviates from the normal, expected manner of data gathering and analysis to achieve the abstract idea of cross-channel customer service. As this Court has previously held, claims that "consist[] of nothing more tha[n] the entry of data into a computer [], the breakdown and organization of that entered data according to some criteria, . . . and the transmission of information derived from that entered data to a computer user, all through the use of conventional computer components, such as a database and processors, operating in a conventional manner" do not confer patent eligibility. *Intellectual Ventures I LLC v. Capital One*, 792 F.3d at 1371; *Smartflash LLC*, 2017 U.S. App. LEXIS 3833, at *13. Taken together, the ordered combination of the claim limitations, considered as a whole, do not add anything inventive to the abstract idea of cross-channel customer service.

NICE argues that the claims of the '955 patent are similar to those in *Amdocs* because "they recite an unconventional ordered combination of web-based tools and processes for tracking and analyzing massive data flows generated from Internet usage." (NOB 53 (citing *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1291 (Fed. Cir. 2016))). The claims at issue in *Amdocs* "allow[ed] network service providers to account for and bill for Internet protocol ('IP') network communications" in a distributed fashion across multiple networks and servers, "minimiz[ing] the impact on network and system resources." *Amdocs*, 841 F.3d at 1291. Each of the asserted claims utilized a "distributed architecture" feature, which allowed the claimed invention to collect and process data at one location close to its source. *Id.* This "distributed architecture" feature was a measurable advancement over prior art systems that were only capable of storing data in one location. *Id.* at 1291-92. While the claims required some generic components, including "network devices," "a central database," and "a user interface server," the components were organized "in an unconventional manner to achieve an improvement in computer functionality." *Id.* at 1300-01. The Court found that the "distributed architecture" feature satisfied the requirement of an inventive concept both individually and in combination with other claim limitations.

The asserted claims are materially distinguishable from those in *Amdocs* for at least the following reasons.   In contrast to the patent in *Amdocs*, the '955 patent does not claim an "advantage over the prior art" or provide "a technological solution to a technological problem specific to computer networks." *Amdocs*, 841 F.3d at 1303.  The '955 claims are directed at cross channel customer service and the specification repeatedly describes the problem presented and solved by the '955 patent as maintaining a consistent customer experience across different channels of communication.  (Appx78, 1:16-43).  NICE's statements at the district court confirm that the '955 patent is directed to increasing the efficiency of well-known strategies for providing customer service recommendations through the use of a computer – not to solving a problem with computers or the Internet. (Appx486).   The '955 patent also does not overcome "a technological problem **inherent in, and created by, the Internet itself**" as NICE alleges in its opening brief.  (NOB 54) (emphasis in original).  The district court found that "the problem the '955 patent purportedly addresses is not itself inherently limited" to the Internet because "[t]he communication channels generally implicated by cross-channel customer service and marketing are not so limited."   (Appx14-15 (noting that it was NICE that limited the claimed invention to the Internet – not the problem addressed by the claimed invention)).   Finally, the only arguably inventive feature of the '955 patent, the "modeled sessions" limitation, is nothing like the "enhance"

limitation in *Amdocs* in that it does not provide any "critical advancement over the prior art" that would cause the otherwise "generic components [to] operate in an unconventional manner to achieve an improvement in computer functionality." *Amdocs*, 841 F.3d at 1300-01. At most, the "modeled session" limitation is an abstract concept implemented in a generic computer environment.

The district court properly considered each of the limitations individually and as an ordered combination before concluding that the claims did not add an inventive concept to the abstract idea of cross-channel customer service. (Appx12; *see supra* at 20-22). That the court focused its analysis on the "modeled sessions" limitation in greater detail is unsurprising given that NICE "argue[d] that the claimed 'modeled sessions' provide an inventive concept." (*Id.*). The court's interpretation of the "modeled sessions" limitation was not misguided, as NICE suggests, but was based on NICE's own statements throughout these proceedings. (Appx18; NOB 56; *see supra* at 17-19 (discussing "modeled sessions" limitation)).

In sum, the '955 patent does not contain any inventive concept because the claim limitations individually and as an ordered combination operate in exactly the same manner as would be expected. The claimed components are not arranged in a way that provides a technological improvement in the way systems extract, associate, store, and analyze information to generate recommendations. Instead, the claims recite the same generic computer components performing the same

conventional processes as the prior art with instructions to apply the steps on a computer.

### 3.    The Claims Improperly Seek To Monopolize A Broad Swath Of Technology

The purpose of the exclusion of abstract ideas from patent eligibility is to prevent the monopolization of "the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Mayo*, 132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) and *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)).

The district court rejected NICE's arguments that the '955 patent would not preempt the cross-channel customer service approaches of many modern businesses because the claims broadly describe "Internet server traffic" and "Internet interaction sessions" that could cover a range of activity conducted over the Internet.  (Appx16).  Additionally, the claims are not limited to calling using a traditional telephone but instead could include "any user-initiated contact with the call center agent."  (*Id.* (citing Appx79, 3:54-59 (stating that "calling" can include "using a traditional telephone or other device such as a VOIP telephone, cellular telephone, or other device, to speak with another person" and could also include "contact[ing] an agent via other methods, such as on-line chat"))).  Because the asserted claims were not so limited, the district court found that they could

effectively "preempt an entire integrated customer service strategy," when any customer uses the Internet and then initiates contact with a call center. (*Id.*).

As discussed above, the concept of generating a customer recommendation by gathering customer data from one communication channel and using it in another to provide a recommendation when the same customer communicates with a customer service agent is a fundamental business practice and "a building block of the modern economy." *Alice*, 134 S. Ct. at 2356. Beyond reciting a generic computer system performing generic computer functions, the asserted claims are devoid of a viable inventive concept. Were the Court to uphold the asserted claims, NICE would effectively be granted a monopoly on the abstract idea.

## **<u>CONCLUSION</u>**

For the foregoing reasons, ClickFox respectfully requests that the Court affirm the district court's judgment.

Dated:  March 23, 2017.

Respectfully submitted,

*/s/ Douglas D. Salyers*
DOUGLAS D. SALYERS
PUJA PATEL LEA
DUSTIN B. WEEKS
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308
(404) 885-3000

ANUP M. SHAH
TROUTMAN SANDERS LLP
201 S. College Street
34th Floor
Charlotte, NC 28202
(704) 998-4050

*Counsel for Defendant-Appellee,*
*ClickFox, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 23rd day of March, 2017, I filed the foregoing

Brief for Defendant-Appellee ClickFox, Inc. with the Clerk of the United States

Court of Appeals for the Federal Circuit via the CM/ECF system, which will send

notice of such filing to all registered CM/ECF users.

*/s/ Douglas D. Salyers*

DOUGLAS D. SALYERS
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308
(404) 885-3000

*Counsel for Defendant-Appellee,*
*ClickFox, Inc.*

# **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,621 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated:  March 23, 2017.                          */s/ Douglas D. Salyers*

DOUGLAS D. SALYERS
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308
(404) 885-3000

*Counsel for Defendant-Appellee,*
*ClickFox, Inc.*